UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEITH BAGLEY #885214,                          Case No. 2:20-cv-150

     Plaintiff,                 Hon. Robert J. Jonker
             U.S. District Judge

 v.

WENDY JAMROS,

     Defendant.
_____/

**<u>REPORT AND RECOMMENDATION</u>**

## I.  Introduction

This Report and Recommendation (R&R) addresses Defendant Nurse Practitioner (NP) Wendy Jamros's motion for summary judgment (ECF No. 28), and Plaintiff state prisoner Keith Bagley's motion for a temporary restraining order (ECF No. 32).

Bagley filed this civil rights action pursuant to 42 U.S.C. § 1983 on August 21, 2020.  Bagley alleges that, on April 9, 2020, in deliberate indifference to his serious medical needs, NP Jamros discontinued and denied various treatments for his heart, back, and migraine-related conditions.  (ECF No. 1.)  NP Jamros asserts that Bagley failed to exhaust his administrative remedies because Bagley's grievance concerning these claims was rejected at all three steps of the grievance process for containing multiple unrelated issues.  Alternatively, NP Jamros argues that she is entitled to summary judgment on the merits because Bagley cannot demonstrate that her

treatment decisions created a serious risk of harm nor that she was aware of such a risk had it existed.

The undersigned concludes that a genuine issue of material fact remains with respect to the question of whether Bagley exhausted his administrative remedies. Accordingly, the undersigned recommends that the Court deny this part of Defendant's motion for summary judgment.  The undersigned concludes, however, that no genuine issue of material fact remains regarding Bagley's claim that Jamros was deliberately indifferent to his serious medical needs, and that Jamros is entitled to judgment in her favor pursuant to Rule 56.  The undersigned respectfully recommends that the Court (1) grant NP Jamros's motion for summary judgment (ECF No. 28), (2) deny Bagley's motion for a temporary restraining order (ECF No. 32), and (3) dismiss Bagley's claim with prejudice.

## II.    Factual Background

Both Bagley and NP Jamros provided affidavits and medical records setting forth the pertinent facts in this case.

### a.  Bagley's Factual Allegations

In April 2006, Bagley underwent major surgery for a back injury.  (ECF No. 29-1, PageID.256.)  In July 2019, Bagley reinjured his back while performing his work detail at Alger Correctional Facility (LMF) in Munising, Michigan.  (*Id.*, PageID.257.) As a result of the reinjury, LMF sent Bagley to consult with off-site Physical Therapist Timothy Young on September 17, 2019.  (*Id.*)  Among other accommodations, Young recommended that LMF provide Bagley with a back brace

and schedule an MRI.  (*Id.*)  The next day, Bagley was transferred to Kinross Correctional Facility (KCF) in Kincheloe, Michigan.  (*Id.*)

On September 27, 2019, Bagley met with NP Jamros.  (*Id.*)  Bagley says that during this appointment, Jamros told him she would be cancelling his order for a back brace and MRI because she saw no need for the order.  (*Id.*)  Bagley told Jamros that she was not qualified to cancel the order because she is not a doctor and asked to see a doctor.  (*Id.*)  NP Jamros proceeded with the appointment and asked Bagley why he was taking Toradol.  (*Id.*)  When Bagley told Jamros it was for his migraines, Jamros told him that she would be treating his migraines with Imitrex instead.  (*Id.*)  The Imitrex made Bagley feel nauseous and caused him to experience hot flashes.  (*Id.*, PageID.258.)

On April 9, 2020, Bagley had another appointment with NP Jamros.  (*Id.*) During this appointment, Bagley indicated that he wanted to stop taking the Imitrex. (*Id.*) Also during this appointment, Jamros discontinued the aspirin prescription that a doctor at LMF had given him to treat his heart condition.  (*Id.*)  When Bagley asked Jamros when he would be getting his MRI and back brace, she indicated that he would not be receiving an MRI or a back brace.  (*Id.*)  Jamros also indicated that she would not prescribe Bagley the cortisone shots he had been receiving at LMF.  (*Id.*) When Bagley asked whether Jamros would put him back on Toradol for his migraines, she told him to take Tylenol instead. (*Id.*, PageID.258-259.)

According to Bagley, he was never disruptive during his appointments, and he never refused treatment.  (*Id.*, PageID.259.)

### b. NP Jamros's Factual Allegations

According to NP Jamros, she had her first appointment with Bagley on September 23, 2019.  (ECF No. 28-3, PageID.223.)  During this appointment, she indicated that Bagley would have to be seen by nursing before receiving Toradol, and prescribed Imitrex as an alternative.  (*Id.*, PageID.224.)  On September 27, 2019, Jamros reviewed Bagley's chart and physical therapy recommendations.  (*Id.*)  After Jamros determined that Bagley did not qualify for a back brace under MDOC guidelines she placed orders for an extra pillow and hot water bottle for Bagley.  (*Id.*)  On October 22, 2019, Jamros had another appointment with Bagley in which she evaluated his migraine and noted that Bagley continued to be prescribed Imitrex.  (*Id.*)  On December 10, 2019, Jamros met with Bagley regarding his requests to be taken off the Imitrex.  (*Id.*)  During the appointment, Bagley requested medication to manage his migraines that had since been taken off formulary.  (*Id.*)   Jamros took him off Imitrex and noted that he had Tylenol and Aspirin to manage his headaches.  (*Id.*)

On April 9, 2020, Jamros had a telephone appointment with Bagley to review labs.  (*Id.*)  At the time, Bagley had two prescriptions for Aspirin—one for 81 mg and one for 325 mg.  (*Id.*)  Jamros asked Bagley whether he would be willing to take only the 325 mg daily.  (*Id.*)  When Bagley complained that he needed Aspirin for his heart, Jamros attempted to explain that he would still be taking Aspirin, just at a different dose.  (*Id.*)   At this point, Bagley hung up on her.  (*Id.*)  On April 27, 2020, Jamros decreased the Aspirin dosage from 325 mg to 81 mg pursuant to Bagley's request.

4

(*Id.*, PageID.225.)  On October 13, 2020, Jamros had another telephone appointment with Bagley, during which he again asked about his back brace and MRI, and Bagley again informed him that he did not qualify for a back brace.  (*Id.*)  Jamros asked Bagley whether he would be interested in a pain management assessment and possible injections for his back, but Bagley only yelled at her, making it impossible to continue the appointment.  (*Id.*)

### c. Bagley's Medical Records

Bagley's medical records reflect that prior to transfer, he was taking 81 mg of Aspirin daily, 325 mg of Aspirin once per day as needed, and one injection of Toradol (listed as Ketorolac Tromethamine) daily.  (ECF No. 28-2, PageID.184.)  On September 23, 2019, Jamros stopped the Toradol, and ordered 50 mg of Imitrex to be taken at the onset of a headache.  (*Id.*, PageID.189.)  On September 27, 2019, NP Jamros reviewed the physical therapist's recommendation and ordered Bagley an extra pillow and a hot water bottle for his back.  (*Id.*, PageID.192.)  On October 22, 2019, Jamros reviewed Bagley's medication and continued his prescriptions for Imitrex and Aspirin.  (*Id.*, PageID.200.)  On December 10, 2019, Jamros met with Bagley regarding his request to be taken off Imitrex.  (*Id.*, PageID.205.)  During the appointment, Bagley informed Jamros that his Tylenol prescription helped to "take[] the edge off" of his headaches.  (*Id.*)  NP Jamros noted that Bagley was irritable throughout the appointment, continuously requested to see a doctor rather than Jamros, and that she eventually ended the appointment.  (*Id.*)  Jamros discontinued Bagley's prescription for Imitrex on that date.  (*Id.*)

A few months later, on February 25, 2020, Bagley met with a different NP, who evaluated his back pain and prescribed him a pain relief injection.  (*Id.*, PageID.210.)  On April 9, 2020, Jamros reviewed Bagley's labs with him, and asked if he would be willing to take his prescription for 325 mg of Aspirin daily and discontinue his separate prescription for 81 mg of Aspirin.  (*Id.*, PageID.212.)  Bagley again became irritable and Jamros ended the appointment.  (*Id.*)  A few weeks later, on April 27, 2020, Jamros reduced Bagley's daily Aspirin prescription to 81 mg dosage.  (*Id.*, PageID.215.)  On June 4, 2020, Bagley was given another injection to manage his back pain.  (*Id.*, PageID.217.)  Several months later, on October 13, 2020, Bagley was seen for his heart, migraines, an unrelated infection, and back pain.  (*Id.*, PageID.218-220.)  He again became hostile towards Jamros during this appointment.  (*Id.*)  Finally, on November 4, 2020, Bagley was seen for continuing back pain.  (*Id.*, PageID.221.)

## III.    Jamros's Motion for Summary Judgment

NP Jamros asserts that Bagley failed to exhaust his administrative remedies, and that his claim is meritless. (ECF No. 28.)

### a.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient

6

disagreement to require submission to a jury[1] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### b. Exhaustion Analysis

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). "[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Accordingly, summary judgment in favor of the party with the burden of persuasion "is

---

[1]     Disputed issues of fact regarding exhaustion under the PLRA may be decided in a bench trial and need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999).

To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*).*  And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.* When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective March 18, 2019), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint.  Inmates must first attempt to resolve a grievable issue informally within two business days of becoming aware of the issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ Q.  If informal resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted informal resolution.  *Id.* at ¶¶ Q, W.  The inmate submits the grievance to a designated Grievance Coordinator, who assigns it to a respondent.  *Id.* at ¶ W.  The Policy Directive also provides the following directions for completing grievance forms:

"The issues should be stated briefly but concisely.  Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id*. at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  MDOC Policy Directive 03.02.130 at ¶¶ U, DD.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances. *Id*. at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id*. at ¶¶ U, HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id*.  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id*. at ¶ II.

NP Jamros asserts that Bagley failed to exhaust his administrative remedies because the grievance he filed against her, KCF-20-04-0382-28C, was rejected as containing multiple unrelated issues at each step of the grievance process.  (ECF No. 28, PageID.180.)   In response, Bagley argues that his grievance was improperly rejected because the issues he grieved were related.  (ECF No. 29, PageID.248-249.) Bagley's Step I grievance form for KCF-20-04-0382-28C reads as follows:

On 4/09/2020, I consulted with Wendy Jamros NP about my heart condition, migraine head-aches, and back condition, medical conditions were heavily documented. During this evaluation, the NP told me that she was taking me off of my aspirin, which was prescribed by a MD for my heart condition; she denied me an MRI, which is badly needed, because without a true examination of my back condition I cannot receive corrective surgery; she denied the recommendation from the Physical Therapist for me to be provided a back brace; she denied me Cordizon shots that I badly need for back; and Toradole shots for my migraine head-aches.  I have a documented history for these conditions, she is aware of my medical conditions, and still has denied me the means to be provided medical treatment.  As a result, I am in serious pain all the time, if its not my back, then it's the migraine head-aches, these pains keep me from sleeping, and at times I go hungry because I cannot make it to the chow hall, I cannot exercise, or stay focus long enough to read a book.  The Court has held that "Since prisoners cannot obtain their own medical services, the constitution requires prison authorities to provide them with 'reasonable adequate' medical care." Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1978). Per PD-03.04.100 I am entitled to medical treatment, and per PD-03.03.130, I have a right against cruel and unusual punishment.

For a means of resolution, I am asking that I be provided the treatment I need, such as, an MRI for my back as it is already documented that I had surgery, and that there is something wrong with my back, I would like my aspirin restored, as the doctor gave them to me for my heart condition, I would like the back brace that the Physical Therapist recommended for me to have.

(ECF No. 1-1, PageID.9; ECF No. 28-4, PageID.231.)  Bagley appealed this grievance

through all three steps of the grievance process prior to filing suit.  (ECF No. 28-4,

PageID.227.)

In interpreting MDOC P.D. 03.20.130 ¶ J(1), this Court has given the term

"multiple unrelated issues," its ordinary meaning—"multiple disputes, concerns, or

problems that are 'not connected or associated.'" McDuff v. Addis, No. 1:17-CV-912,

2018 WL 3239491, at *3 (W.D. Mich. July 3, 2018) (citation omitted).[2]  In *McDuff*, this Court considered whether a grievance complaining of deliberate indifference based on two separate attacks and two separate misconduct tickets was properly rejected for grieving multiple unrelated issues.  *Id.* at *2.  The Court determined that the grievance was improperly rejected, as it raised "four events pertaining to a single issue."  *Id.* at *2.  In *Freeman v. Holmes*, the Court applied the same reasoning to a claim of deliberate indifference concerning decisions made by MDOC healthcare officials.  No. 1:19-CV-728, 2020 WL 4194483, at *5 (W.D. Mich. June 24, 2020), *report and recommendation adopted*, No. 1:19-CV-728, 2020 WL 4192564 (W.D. Mich. July 21, 2020).  There, the plaintiff complained that after he was denied proper shoes, he developed ulcers and later an infection that were not promptly treated.  *Id.*  The defense argued that the grievance had been properly rejected as grieving multiple unrelated issues because it would have required multiple investigations to resolve.  *Id.*  While the Court indicated its belief that all the events could have been reviewed under a single investigation, it nonetheless stated that rejecting a grievance because each event therein would require a separate investigation reads an "unwarranted limitation into the grievance policy."  *Id.*  There, as in *McDuff*, the Court read the grievance as concerning multiple events related to a single issue.  *Id.*

NP Jamros argues that *McDuff* and *Freeman* are inapplicable to this case. Specifically, she states that "[Bagley's] grievance alleges multiple issues that did not

---

[2]     In the version of P.D. 03.02.130 in effect at the time of *McDuff*, the bases for rejection were outlined in P.D. 03.02.130 ¶ G(1). P.D. 03.02.130 (effective July 7, 2007, superseded March 18, 2007).

take place on the same day . . . and cannot be responded to without individually assessing each issue." (ECF No. 30, PageID.299.)   The undesigned respectfully disagrees.

As in *McDuff*, Bagley's grievance centered on one issue: NP Jamros's deliberate indifference to his serious medical needs.   Jamros attempts to distinguish this case from *McDuff* on the basis that the underlying events occurred on different dates, and from *Freeman* on the basis that the underlying events concerned the treatment of multiple conditions. The undersigned finds these distinctions to be immaterial.   As stated above, the exhaustion requirement is intended to clarify a prisoner's claims and provide prison officials with notice of the claims so that they may attempt resolution internally before the case is brought to federal court.   *Porter*, 534 U.S. at 524.   As emphasized by this Court in *McDuff*, its purpose is not "to bar all but the most artfully drafted grievances from receiving a decision on the merits." No. 1:17-CV-912, 2018 WL 3239491, at *4.   To construe "multiple unrelated issues" to encompass multiple treatment decisions by a single practitioner, all of which a plaintiff claims to exhibit the practitioner's deliberate indifference to his serious medical needs, would be too broad an application of P.D. 03.20.130 ¶ J(1).   Because Bagley's grievance sets forth a series of events pertaining to a single issue — NP Jamros's deliberate indifference to his serious medical needs — the undersigned finds that there is a genuine issue of material fact as to whether Bagley exhausted his administrative remedies.   The undersigned now turns to the merits of Bagley's claims.

### c. Deliberate Indifference Analysis

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).  The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In

14

> such circumstances, medical proof is necessary to assess whether the
> delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).  Thus, *Napier* and *Blackmore* provide

a framework for assessing a claim of delayed or inadequate care, or for a non-obvious

condition:  A plaintiff making this type of claim must place verifying medical evidence

in the record to show the detrimental effect of the delayed or inadequate treatment.

The subjective component requires an inmate to show that prison officials have

"a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207

F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  Deliberate indifference

"entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be

"satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result."  *Id.*  Under *Farmer*, "the official must

both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  The

subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721

(6th Cir. 2018).  There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not
> suffice to establish deliberate indifference.  Instead, the plaintiff must
> show that each defendant acted with a mental state "equivalent to
> criminal recklessness."  This showing requires proof that each defendant
> "subjectively perceived facts from which to infer substantial risk to the
> prisoner, that he did in fact draw the inference, and that he then
> disregarded that risk" by failing to take reasonable measures to abate
> it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective
> recklessness: A jury is entitled to "conclude that a prison official knew
> of a substantial risk from the very fact that the risk was obvious."  And
> if a risk is well-documented and circumstances suggest that the official

15

has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of *739 serious harm."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a

16

deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental

fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Here, Bagley first complains that Jamros took him off the aspirin he was prescribed to treat his heart condition. (ECF No. 1, PageID.2.)  Bagley's medical record from April 9, 2020, shown below, reflects that Jamros discontinued the prescription for 81 mg of Aspirin daily in exchange for a prescription for 325 mg of Aspirin daily.

**Michigan Department of Corrections**
**Clinical Encounter - Administrative Note**

| Offender Name: | Bagley, Keith Allen | | | Off #: | 0885214 |
|---|---|---|---|---|---|
| Date of Birth: | [REDACTED] | Sex: | M | Facility: | KCF |
| Note Date: | 04/09/2020 12:02 | Provider: | Jamros, Wendy [WJ] NP | Unit: | E1 |

MP Telephone Encounter encounter performed at Telephone Encounter.
**Administrative Notes:**

ADMINISTRATIVE NOTE   1      Provider:   Jamros, Wendy [WJ] NP

Patient was contacted regarding his CC issues. Labs were reviewed with the patient. I asked if he would be willing to stop his ASA 81mg and just take his ASA 325mg daily (he uses for headaches 3 times weekly). He stated "that won't work, I use that one for my heart." I tried to explain that this was the same medication at a different dosage and he forcefully and rudely stated "just do what you want, you will anyway" and he slammed down the phone.  See previous documentation.

12/10/19: Patient is here because he wanted to be taken off his Imitrex.. I began to review his medications and he stated, "how hard is it to see a Dr. around here." I re-directed and clarified that he takes Tylenol or ASA 325mg occasionally to manage his headaches and he stated "it takes the edge off." He confirms he never uses his Nitro for chest pain. He states he cannot take Imitrex because he experiences the side effects of nausea and flushing. When he asked if he wanted to try a different anti-inflammatory he stated the thing that used to work was "that pill with caffeine in it." I clarified that that has been taken off the formulary. He stated, "only for some people." I re-iterated that it is no longer on the formulary. He again said, "how hard is it to see a Dr. around here." He presented irritable and demanding. I asked him to leave. His Imitrex will be discontinued and he can continue with his Tylenol and ASA. He can kite if he has further needs.

**ASSESSMENTS:**

Chronic ischemic heart disease, unspecified, I25.9 - Current, Chronic, Initial

Disorder of the skin and subcutaneous tissue, unspecified, L98.9 - Current, Chronic, Initial

Gastro-esophageal reflux disease without esophagitis, K21.9 - Current, Chronic, Initial

Hyperlipidemia, unspecified, E78.5 - Current, Chronic, Initial

Migraine, unsp, not intractable, without status migrainosus, G43.909 - Current, Chronic, Initial

**New Medication Orders:**

| Rx# | Medication | Order Date | Start Date | Quantity | Prescriber Order |
|---|---|---|---|---|---|
| | ASPIRIN (NON-COATED) 325 MG TABS | 04/09/2020 12:02 | 04/09/2020 | | 325mg By Mouth daily x 210 day(s) |

Indication:   Chronic ischemic heart disease, unspecified

**Renew Medication Orders:**

| Rx# | Medication | Order Date | Start Date | Quantity | Prescriber Order |
|---|---|---|---|---|---|
| 5026754 7 | APAP 325MG TABS | 04/09/2020 12:02 | 04/09/2020 | 180 | TAKE 2 TABS  BY MOUTH THREE TIMES DAILY AS NEEDED FOR  HEADACHE MAY REFILL 5 TIMES KITE FOR REFILLS x 210 day(s) |

Indication:   Migraine, unsp, not intractable, without status migrainosus

(ECF No. 28-2, PageID.212.)  Indeed, the record shows that the once-daily 325 mg prescription was prescribed for "[c]hronic ischemic heart disease, unspecified."[3]  (*Id.*)

---

[3]    Bagley does assert in a sworn declaration that NP Jamros took him off the aspirin completely.  (ECF No. 29-1, PageID.258.)   However, this assertion is insufficient to create a genuine issue of material fact considering the medical records reflecting his new and renewed prescriptions for Aspirin.  (ECF No. 28-2, PageID.212.)

Jamros also prescribed 325 mg of Tylenol to be taken three times a day as needed for his headaches.  (*Id.*)

Next, Bagley complains that NP Jamros denied his requests for an MRI and the physical therapist's recommendation for a back brace, and refused to give Bagley a Cortisone shot for his back.  (ECF No. 1, PageID.3.)  The medical record shown below reflects that Jamros reviewed all of the physical therapist's recommendations.

MICHIGAN DEPARTMENT OF CORRECTIONS - BUREAU OF HEALTH
CARE SERVICES
_____

PATIENT:            KEITH BAGLEY
DATE OF BIRTH:      ▮▮▮▮▮▮▮
DATE:               09/27/2019 8:44 AM
VISIT TYPE:         Chart Update
_____

**Chief Complaint/Reason for visit:**
This 50 year old male presents with pt recommendations.

**History of Present Illness**
1.  **PT recommendations**
Additional comments:
Reviewed from previous facility:  9/17/19 PT recommendations. 1. Lumbar velcro back brace for support, 2. HWB for pain management, 3. F/U with PCP in 6 to 8 weeks if symptoms do not improve and consider lumbar MRI to assess disc integrity.

(ECF No. 28-2, PageID.191.)  Ultimately, Jamros did order an extra pillow and hot water bottle for Bagley, as recommended by the physical therapist.  (*Id.*, PageID.192.) She also determined that Bagley did not meet the MDOC criteria for a back brace. (*Id.*, PageID.197.)  Bagley did not indicate that his back pain was ongoing or request a follow-up appointment regarding his back until January 11, 2020.

**Michigan Department of Corrections**
**Kite Response**

| Offender #: 0885214 | Offender Name: Bagley, Keith Allen | |
|---|---|---|
| Location: KCF - KINROSS CORRECTIONAL FACILITY | | Lock: E1:137:Bot:E1 |

| | |
|---|---|
| Discipline: | Medical |
| Received Date: | 01/12/2020 |
| Initiated Date: | 01/11/2020 |
| Taken By: | Knack, Jessica [JK6] RN |
| Request Type: | Medical Question |
| Request Summary: | Has f/u been scheduled for back pain and PT recommendations for an MRI? |
| Plan/Action: | Your next appointment is scheduled in April. |
| Comments: | The PT recommendations are not orders and any recommendations are evaluated by the facility medical provider and followed up on if deemed necessary. |

(*Id.*, PageID.208.)

Bagley was then seen for his back pain on February 25, 2020.

**Michigan Department of Corrections**
**Clinical Encounter**

| Offender Name: Bagley, Keith Allen | | | Off #: | 0885214 |
|---|---|---|---|---|
| Date of Birth: | | Sex: M | Facility: | KCF |
| Encounter Date: 02/25/2020 16:01 | | Provider: Weist, Tara M. [TW3] NP | Unit: | E1 |

Provider Evaluation encounter performed at Clinic.

**SUBJECTIVE:**

| COMPLAINT 1 | Provider: Weist, Tara M. [TW3] NP |
|---|---|
| Chief Complaint: | Muskuloskeletal |
| Subjective: | Pt presents with c/o chronic low back pain w/radiation to left down posterior left thigh (S1 region) to back of knee. Pt had xray done 7/6/19 which showed that he had mild osteoarthritis and evidence of surgical intervention. Pt went to physical therapy 9/17/19. Pain is generally 4-5/10. Has h/o trauma due to blunt injury per pt hx. |

(*Id.*, PageID.209.)   At this time, Bagley reported that the amount of pain he was experiencing was around a four or five out of ten.  (*Id.*)  The records indicate that he was given an injection for pain management.



(*Id.*, PageID.210.)  The medical records do not indicate that Bagley complained of pain again until after his appointment with NP Jamros on April 9, 2020.

Finally, Bagley complains that NP Jamros refused to give him a Toradol shot to treat his migraine headaches.  (ECF No. 1, PageID.3.)  As shown below, Bagley's records indicate that after arriving at KCF, he agreed to try Imitrex to treat his migraines instead of Toradol.

22

## MICHIGAN DEPARTMENT OF CORRECTIONS - BUREAU OF HEALTH CARE SERVICES

PATIENT:                    KEITH BAGLEY
DATE OF BIRTH:
DATE:                       09/23/2019 10:12 AM
VISIT TYPE:                 Provider Visit-scheduled

**Chief Complaint/Reason for visit:**
This 50 year old male presents with headaches.

**History of Present Illness**
**1. Headaches**
Patient has been treated for headaaches with Toradol as a standing order. I informed him that he would need to be seen by nursing before any Toradol would be adminsinistered. He agrees to try Imitrex.
 It occurs intermittently.  The problem is unchanged.  Location was frontal left, frontal right, parietal left and parietal right. The patient describes it as dull and throbbing.  Associated symptoms include nausea, phonophobia, photophobia and scotomata.  Pertinent negatives include blurred vision, dizziness or vomiting.  Additional information: history of migraine.

(ECF No. 28-2, PageID.187; ECF No. 29-7, PageID.292.)

NP Jamros only took Bagley off the Imitrex upon Bagley's request several months later.

## MICHIGAN DEPARTMENT OF CORRECTIONS - BUREAU OF HEALTH CARE SERVICES

PATIENT:                    KEITH BAGLEY
DATE OF BIRTH:
DATE:                       12/10/2019 12:01 PM
VISIT TYPE:                 Provider Visit-scheduled

**Chief Complaint/Reason for visit:**
This 51 year old male presents with headache.

**History of Present Illness**
**1. Headache**
Additional comments:
Patient is here because he wanted to be taken off his Imitrex... I began to review his medications and he stated, "how hard is it to see a Dr. around here." I re-directed and clarified that he takes Tylenol or ASA 325mg occasionally to manage his headaches and he stated "it takes the edge off." He confirms he never uses his Nitro for chest pain. He states he cannot take Imitrex because he experiences the side effects of nausea and flushing. When he asked if he wanted to try a different anti-inflammatory he stated the thing that used to work was "that pill with caffeine in it." I clarified that that has been taken off the formulary. He stated, "only for some people." I re-iterated that it is no longer on the formulary. He again said, "how hard is it to see a Dr. around here." He presented irritable and demanding. I asked him to leave. His Imitrex will be discontinued and he can continue with his Tylenol and ASA. He can kite if he has further needs.

23

(*Id.*, PageID.205.)  Bagley's medical records do not reflect that he complained about his migraines or the treatment thereof until after the April 20, 2019 appointment.

The above records demonstrate that NP Jamros treated all the conditions underlying Bagley's complaint.  Bagley did not place anything on the record demonstrating that Jamros's course of treatment was woefully inadequate or detrimental to Bagley's health.  *Napier*, 238 F.3d at 742.  Instead, Bagley's medical records reflect a difference in judgment between NP Jamros and Bagley, and that Bagley believed he should be seen by a doctor.  Because Bagley has not provided evidence of inadequate care, and the medical records at most reflect a difference in judgment, there are no genuine issues of material fact as to either the objective or subjective component of Bagley's claim, and the undersigned finds that NP Jamros is entitled to summary judgment.

## IV.    Bagley's Motion for a Temporary Restraining Order

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies."  *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).  The issuance of preliminary injunctive relief is committed to the discretion of the district court.  *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).  In exercising that discretion, a court must balance the following factors: (1) whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiff has shown irreparable injury; (3) whether the issuance of a preliminary

24

injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing a preliminary injunction. *United States v. Szoka*, 260 F.3d 516, 523 (6th Cir. 2001); *Washington v. Reno*, 35 F.3d 1093, 1098 (6th Cir. 1994); *Higgs v. Bland*, 888 F.2d 443, 448 (6th Cir. 1989).  These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers.  *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009.  Moreover, when a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting.  *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

Under controlling Sixth Circuit authority, Bagley's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action.  *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).  Considering the undersigned's above determination that Jamros is entitled to summary judgment, Bagley has not made such a showing.

Second, the presence of irreparable harm is not evident.  A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages.  *See Overstreet*, 305 F.3d at 578.  In this motion, Bagley asserts that NP Jamros improperly interfered with his visit to healthcare on September 1, 2021.  (ECF No. 32-1, PageID.311.) According to Bagley, he was visiting with a nurse from healthcare when he asked the nurse what it would take for him to see a doctor.  (*Id.*)  After the nurse informed Bagley that he did not have to be seen by the nurse, Bagley claims that Jamros came out of her office and directed Bagley to leave before he could inform the nurse that he wanted to continue with the visit. (*Id.*)  Bagley asserts that he fears he will suffer irreparable harm if Jamros is permitted to "continue her retaliatory conduct," namely nerve damage.  (*Id.*)  There is no evidence that Jamros directed Bagley to leave healthcare to retaliate against him.[4]  Furthermore, Bagley has not set forth specific facts showing that he will sustain nerve damage in the absence of an injunction.

Finally, the interests of identifiable third parties and the public at large weigh against an injunction.  Decisions concerning a prisoner's medical treatment are vested in prison healthcare officials, in the absence of a constitutional violation.  Any interference by the federal courts in the administration of state prisons is necessarily disruptive.   The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation

---

[4]    The undersigned notes that there is, on the other hand, a great deal of documentation concerning Bagley's propensity to become hostile with MDOC healthcare staff when he is not permitted to see a doctor.  (*See* ECF No. 28-2.)

of constitutional rights.  *See Glover*, 855 F.2d at 286-87.  That showing has not been made here.

## V.   Recommendation

The undersigned respectfully recommends that the Court (1) grant NP Jamros's motion for summary judgment (ECF No. 28), (2) deny Bagley's motion for a temporary restraining order (ECF No. 32), and (3) dismiss Bagley's claim with prejudice.


Dated:   December 20, 2021                    /s/ *Maarten Vermaat*
                                                    MAARTEN VERMAAT
                                                    U. S. MAGISTRATE JUDGE




### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).